UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
LAURA PROPST, et al.,

                              **Plaintiffs,**　　　　　　　**OPINION AND ORDER**

   -against-　　　　　　　　　　　　　　　　06 CV 606 (NG) (VVP)

ASSOCIATION OF FLIGHT,
ATTENDANTS, et al.,

                              **Defendants.**
-------------------------------------------------------------X

**GERSHON, United States District Judge:**

Plaintiffs are US Airways, Inc. ("US Airways" or "the mainline carrier") flight attendants who were hired in or after September 1999, and who agreed to work for MidAtlantic Airways ("MidAtlantic") while they were furloughed from US Airways. Defendant Association of Flight Attendants ("AFA") is an unincorporated labor union that has served as plaintiffs' exclusive collective bargaining representative during all times relevant to this case. Defendant Patricia A. Friend is the AFA President and is named in her official capacity.

The claims presented here are nearly identical to those presented by US Airways pilots in *Naugler v. Air Line Pilots Ass'n, Int'l*, No.05-4751 (E.D.N.Y.), which is also decided today. Plaintiffs allege that defendants repeatedly misrepresented and concealed the fact that MidAtlantic was a division of US Airways, and not a wholly-owned subsidiary, in order to "secretly recall" them into US Airways' employ without entitling them to those employment rights provided for in their collective bargaining agreement with the mainline carrier. Plaintiffs accordingly challenge the terms of their MidAtlantic employment and claim that defendants' conduct breached their duty of fair representation to them under the Railway Labor Act, 45 U.S.C. §§ 151-188, and violated the

Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961-1968. Defendants now move to dismiss the complaint in its entirety under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1]

**FACTS**

The following facts are alleged in the First Amended Complaint and are accepted as true for purposes of this motion:[2]

AFA is an unincorporated labor union that represents approximately 46,000 flight attendants at 22 different carriers throughout the United States. At each airline that it represents, AFA acts through a Master Executive Council ("MEC") that serves as the coordinating council for union membership and is comprised of flight attendants from the represented airline. At all relevant times, AFA served as the exclusive bargaining representative for plaintiffs and acted through the US Airways MEC. Both AFA and the US Airways MEC were authorized to act on behalf of the represented flight attendants and participate in collective bargaining activities with airline management. In its capacity as the exclusive bargaining representative, AFA, on behalf of plaintiffs

---

[1] Plaintiffs commenced this action on February 9, 2006 and filed their First Amended Complaint on July 7, 2006 against the above defendants as well as US Airways, US Airways Group, Inc., and America West Airlines, Inc. ("America West"). The non-AFA defendants were thereafter voluntarily dismissed. Because Count II was alleged only against US Airways, US Airways, Group, Inc., and America West, the claims being considered in this motion to dismiss are Counts I, III, IV, V, and VI of the First Amended Complaint, which are all brought against the AFA defendants.

[2] Plaintiffs have not contested the defendants' attachment of two documents to their motion to dismiss. The documents, which are the July 2002 and December 2002 amendments to the Collective Bargaining Agreement, were referred to in the Amended Complaint and plaintiffs' briefs. A complaint is deemed to included "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991). The court may take these documents into consideration when deciding a motion to dismiss, without converting the motion to one for summary judgment. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

and other represented members of the airline, entered into a collective bargaining agreement ("CBA") with US Airways to govern the terms and conditions of plaintiffs' employment, including their rights related to compensation, seniority, furlough, and recall. The governing provisions included not only the content of the agreement at the time of its promulgation, but also any subsequent side letters, memoranda of understanding, and letters of agreement amending the original CBA.

As discussed in more detail in *Naugler*, US Airways experienced significant financial difficulties in the period preceding and following the terrorist attacks of September 11, 2001. In addition to its two applications for bankruptcy protection, the airline furloughed more than 1,000 flight attendants between September 2001 and September 2003. US Airways also restructured its operations to incorporate more cost-effective regional jets to feed smaller passenger loads to and from the mainline carrier's hubs. To that end, in July 2002, AFA asked its membership to vote on a restructuring plan that would amend the terms of the CBA in light of the airline's financial crisis. The agreement provided in pertinent part that "US Airways is establishing a new wholly-owned subsidiary, MidAtlantic Airways, which will operate as regional jets." Then on December 20, 2002, AFA presented its members for ratification a proposal amending the earlier restructuring plan. This proposal provided, "The Company may operate MDA as a separate division within mainline . . . . Wages, benefits, and work rules will match the AA Eagle flight attendant agreement."

Beginning in or about 2002, after the spurt of furloughs had already begun, US Airways widely publicized its plan to operate a separate airline, to be known as MidAtlantic Airways, that would employ regional jets to feed its mainline operation. Specifically, US Airways announced that it intended to transfer the operating certificate for Potomac Air, a planned airline for which US Airways had already applied for such a certificate, to MidAtlantic so that it would operate as an

3

independent entity. US Airways also purchased, leased, and acquired options to purchase several smaller aircraft[3] and, starting in or about March 2004, MidAtlantic began the process of hiring approximately 300 furloughed flight attendants. The costs associated with MidAtlantic's development were subsidized by pressuring mainline flight attendants during collective bargaining to agree to an array of concessions to their employment terms. For reasons unknown to plaintiffs, however, the initial plan to transfer the certificate never materialized, and US Airways operated MidAtlantic as a division under its own operating certificate. Plaintiffs allege that neither US Airways nor AFA informed them at any point that the airline had abandoned its initially announced plan.

In or about October 2003, the Federal Aviation Administration ("FAA") closed down MidAtlantic before it began its full operation on the grounds that US Airways had been improperly operating MidAtlantic as if it were an independent airline when it was actually a division of the mainline carrier. US Airways responded by redesigning the MidAtlantic operation, including revamping the training manuals and portions of the flight operations manuals to conform exactly to US Airways' own procedures. When dealing with the FAA, US Airways officials also referred to MidAtlantic as the "MidAtlantic Division of US Airways", and, as late as October 2004, US Airways management personnel confirmed to the FAA in writing that the aircraft being flown under the name "MidAtlantic" was actually a fleet type at US Airways. Plaintiffs allege that US Airways employees always believed that the airline had acquired a separate operating certificate for MidAtlantic and that the airline "continued to present MidAtlantic as, putatively, a separate entity."

---

[3] Specifically, US Airways purchased, leased, and acquired options to purchase several "regional jet" aircraft known as the Embraer 170 and the Embraer 190. Both aircraft are physically smaller and accommodate fewer passengers than the various mainline aircraft typically flown by the airline.

4

Am. Compl. ¶¶ 188-89. When flight attendants were recruited for MidAtlantic employment, for instance, US Airways claimed that their employment would be under MidAtlantic's operating certificate. US Airways also painted "US Airways Express" on MidAtlantic's aircraft, even though the label referred specifically to the airline's wholly-owned subsidiaries, and moved its MidAtlantic fleet to the US Airways Express terminals. US Airways and AFA also announced at some point that a separate collective bargaining agreement would govern the terms of MidAtlantic employment and required hired flight attendants to sign a document indicating that there would be modifications to pay, benefits, and work rules. About a month before MidAtlantic commenced operations in April 2004, US Airways officials announced that, while not all employee pay issues had been resolved, it had come to an agreement with AFA that MidAtlantic flight attendants would receive about $1,600 a month. The MEC knowingly approved the modification to flight attendants' pay rates without submitting the change for either balloting or ratification.

By the early part of 2004, US Airways also announced that the terms of MidAtlantic employment would largely replicate the terms of a collective bargaining agreement negotiated on behalf of employees of American Eagle, the commuter line for American Airlines.[4] These terms were ultimately codified by a Letter of Agreement modifying the CBA and providing that "[w]ages, benefits and work rules will match" the American Eagle agreement.[5] *Id.* ¶ 250. MidAtlantic flight attendants learned thereafter that their pay would change from an hourly pay rate based on their US

---

[4] American Eagle is a wholly-owned subsidiary of American Airlines and/or AMR Group, Inc., the parent corporation of American Airlines. Neither company has any affiliation with MidAtlantic or US Airways.

[5] This American Eagle provision appears as early as the December 2002 amendment to the restructuring plan, but plaintiffs suggest that the terms were codified some time in 2004 in a Letter of Agreement. For purposes of this motion, the court accepts as true plaintiffs' allegation that a Letter of Agreement in 2004 set forth these terms.

Airways tenure to first-year pay on the American Eagle contract, which had already been successfully re-negotiated to give American Eagle employees substantially higher pay.

On or about February 20, 2004, the FAA certified MidAtlantic aircraft, and US Airways took delivery of these aircraft the following month. MidAtlantic established several crew bases at US Airways hubs in various cities and planned to start up operations in the first half of April 2004. Plaintiffs allege that "[i]n virtually every aspect of their professional lives," they were "reminded, in a variety of ways, that they were employed by 'MidAtlantic.'" *Id.* ¶ 214. Flight attendants eligible for MidAtlantic employment received pre-employment notification from "MidAtlantic Airways", as opposed to US Airways. The aircraft they flew were emblazoned with the name "MidAtlantic, operated by U.S. Airways", paychecks indicated that payment was made by, or on behalf of, "MidAtlantic", and the actual pay and benefits were commensurate with what was offered by other regional carriers. Plaintiffs also allege that AFA formed a separate MidAtlantic MEC to negotiate a separate collective bargaining agreement on behalf of "MidAtlantic" flight attendants and to perpetuate the fiction that MidAtlantic was its own separate entity.

Plaintiffs allege that, because MidAtlantic was merely an appellation to "describe certain flying performed by US Airways," flight attendants hired by MidAtlantic were technically recalled US Airways flight attendants who were entitled to the protections offered under the CBA. *Id.* ¶¶ 223-26. Plaintiffs further allege that AFA at all times knew the truth about MidAtlantic's corporate form and that so-called MidAtlantic flight attendants were not being accorded wages and benefits consistent with the CBA. Instead of informing plaintiffs of these facts, defendants camouflaged the truth and thereby intentionally misled or at the least, acquiesced in misleading plaintiffs about a "pivotal" fact affecting the status of their employment and employment rights. *Id.* ¶ 222.

**DISCUSSION**

Plaintiffs bring five Counts against defendants, four of which assert claims for defendants' alleged breach of their duty of fair representation (Counts I, III, IV, and V) and one for violation of RICO (Count VI).

**I.     Standard of Review**

Defendants bring this motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. In considering a motion to dismiss made pursuant to Rule 12(b)(6), the court must accept the factual allegations in the complaint as true and draw all reasonable inferences in favor of plaintiffs. *See Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir. 1998). The court's function is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Bell Atlantic Corp. v. Twombly*, --- U.S. ---, 127 S. Ct. 1955, 1964 (2007) (internal quotation marks, citations, and alterations omitted). Indeed, a plaintiff must assert "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. This "plausibility standard" is a flexible one, "oblig[ing] a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007).

**II.    Duty of Fair Representation**

The duty of fair representation, although not an explicit statutory requirement, has been fashioned judicially as a corollary to "the exclusive agent's statutory authority to represent all

7

members of a designated unit" and requires the union "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 76-77 (1991); *see Vaca v. Sipes*, 386 U.S. 171, 177 (1967). A union, as the exclusive bargaining representative of the employees it represents, owes the employees a duty to represent them fairly in collective bargaining with the employer and in enforcing the resulting collective bargaining agreement. *See Vaca*, 386 U.S. at 177; *Steele v. Lousiville & N.R. Co.*, 323 U.S. 192, 201-02 (1944). "A union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 44 (1998). Establishing that the union's actions were "arbitrary, discriminatory, or in bad faith" is "only the first step toward proving a fair representation claim", as the plaintiffs "must then demonstrate a causal connection between the union's wrongful conduct and their injuries." *Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 126 (2d Cir. 1998).

The statute of limitations for a breach of the duty of fair representation claim is six months. *See DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 170-72 (1983); *Eatz v. DME Unit of Local Union Np. 3 of the Int'l Bhd. of Elec. Workers, AFL-CIO*, 794 F.2d 29, 33 (2d Cir. 1986). In cases where union members have sued their union for a breach of the duty of fair representation, the Second Circuit has long held that "the cause of action accrue[s] no later than the time when plaintiffs knew or reasonably should have known that . . . a breach ha[s] occurred." *Santos v. District Council of New York City*, 619 F.2d 963, 969 (2d Cir. 1980); *Ramey v. District 141, Int'l Assoc. of Machinists & Aerospace Workers*, 378 F.3d 269, 278 (2d Cir. 2004). And, once the plaintiffs learn of the union's breach, the union's subsequent failure to fairly represent plaintiffs cannot be treated

as a "continuing violation" that precludes the running of the limitations period. *Buttry v. General Signal Corp.*, 68 F.3d 1488, 1492 (2d Cir. 1995) (internal quotation marks and citations omitted).

Plaintiffs commenced this action on February 9, 2006. To be considered timely, their duty of fair representation claims must have accrued no earlier than August 9, 2005.

### A. Counts I, IV

Defendants seek to dismiss Counts I and IV of the plaintiffs' Amended Complaint as time-barred under the six-month statute of limitations for duty of fair representation claims. In Count I, plaintiffs allege that defendants breached their duty of fair representation by "failing to inform flight attendants of the true state of affairs with regard to the formation of MidAtlantic . . . and by failing to take the position that the 'MidAtlantic' flight attendants were entitled to the wages and benefits called for in the [CBA]." Am. Compl. ¶ 228. In Count IV, plaintiffs allege that defendants breached their duty to them by applying the terms of an irrelevant American Eagle contract and ultimately "failing to take steps to advocate that the 'MidAtlantic' flight attendants be paid in accordance with the [CBA]." *Id.* ¶¶ 254-56. Defendants argue that plaintiffs' claims accrued in December 2002 when AFA finalized and memorialized its agreement with US Airways regarding MidAtlantic's corporate form and the terms of employment. Plaintiffs assert that their claim could not have accrued prior to the commencement of MidAtlantic's operations and before it could be determined who would be eligible for employment. They claim that the appropriate accrual date is in September 2005, or when the *Naugler* plaintiffs organized to file their lawsuit and they first learned that MidAtlantic was a separate entity. Plaintiffs request leave to amend their complaint to explicitly allege this fact.[6]

---

[6] Plaintiffs also request leave to amend in order to clarify ¶ 291 of their First Amended Complaint, where they allege that "[as] late as the latter part of June 2005," MidAtlantic flight

9

Plaintiffs knew or reasonably should have known of the defendants' breach in December 2002, when US Airways and AFA entered into the agreement amending the terms of MidAtlantic employment and providing that US Airways "may operate MDA as a separate division within mainline." Plaintiffs argue that this provision did not necessarily contravene the July 2002 agreement, which stated that "US Airways is establishing a new wholly-owned subsidiary, MidAtlantic Airways", or "nullify the earlier reportage" that MidAtlantic would be its own independent entity. Pfs. Opp. Mem. at 4. They also argue that the December 2002 agreement did not expressly designate MidAtlantic as "merely an appellation given to certain flying performed by US Airways." *Id.* Although plaintiffs did not know definitively whether MidAtlantic would actually operate as a division of US Airways when the December 2002 agreement was executed, they did know or reasonably should have known that the terms of employment provided therein were negotiated irrespective of MidAtlantic's corporate form. In other words, the agreement provided plaintiffs actual notice that defendants had rendered a significant bargaining point as to the corporate form as irrelevant and that AFA had taken a negotiating position adverse to their interests. *See Palancia v. Roosevelt Raceway, Inc.*, 551 F. Supp. 549, 553 (E.D.N.Y. 1982), *aff'd mem.*, 742 F.2d 1432 (2d Cir. 1983) ("[U]nion members are charged with knowledge of the contents of their collective bargaining agreement."); *Ramey*, 378 F.3d at 278 (holding that "the breach occurs when

---

attendants were unclear as to the true identity of their employer as well as about other employment issues. Defendants assert that ¶ 291 is a concession from plaintiffs that they "were relieved of any conceivable confusion regarding the identity of their employer" by June 2005. According to defendants, therefore, even the most generous time of accrual falls outside the 6-month limitations period. Plaintiffs correct defendants' misinterpretation of ¶ 291 as establishing timeliness for purposes of the duty of fair representation limitations period. They explain that the allegation merely establishes the fact that they lacked knowledge about these employment issues as late as June 2005, and not that they learned the truth by then. Plaintiff's reading is a reasonable inference to which they are entitled for purposes of this motion.

10

the union acts against the interest of its members").

Plaintiffs essentially ask the court to toll the accrual date on the grounds that MidAtlantic had not officially commenced its operations and employees had not yet been identified by the time of the December 2002 agreement. However, plaintiffs knew that defendants entered into the agreement on their behalf and that any amendment would affect their rights under the CBA as US Airways flight attendants. If, as plaintiffs allege, they were technically recalled under the CBA by working for a division of the mainline carrier, the December 2002 agreement provided them with actual notice that defendants had violated the terms of the CBA by agreeing to inferior wages and benefits that were not contingent on MidAtlantic's corporate form. *See Steele*, 323 U.S. at 201-02 (holding that the union owes its representatives a duty to enforce the terms of the negotiated collective bargaining agreement). Any claim that plaintiffs had for defendants' breach of its duty of fair representation accrued in December 2002. Plaintiffs did not bring any claims against defendants within six months of that date and they cannot now, after knowingly accepting employment at MidAtlantic, toll the statute of limitations on the grounds they assert. Even if the court were to accept plaintiffs' reasons for tolling the limitations period, their claims would still be time-barred. Plaintiffs acknowledged at oral argument that the last date they were hired by MidAtlantic was either the end of 2004 or the beginning of 2005. *See* Oral Arg. Tr. (Mar. 7, 2008) at 68. Thus, at the very latest, plaintiffs had actual notice at least several months before August 9, 2005 that their employment with MidAtlantic was governed by the terms of the CBA, as amended in December 2002. Counts I and IV are thereby dismissed as time-barred.[7] Plaintiffs' request for

---

[7] Defendants argue in the alternative that plaintiffs were aware of the terms of their employment by the time MidAtlantic operations commenced in April 2004 and cite to several allegations in the Amended Complaint indicating that plaintiffs knew or reasonably should have known that they would receive modified, inferior terms as MidAtlantic employees. Defendants'

leave to amend their complaint to explicitly set forth September 2005 as their accrual date is therefore also denied.

### B. Counts III and V

Defendants seek to dismiss Counts III and V, both of which seek declaratory relief, on the grounds that claims for declaratory relief must fail when the substantive claims on which they rest fail.[8] The Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, does not provide "an independent cause of action" but rather its "operation is procedural only—to provide a form of relief previously unavailable." *In re Joint Eastern & Southern District Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993). The court may "only enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief." *Id.* The declaratory relief sought in Counts III and V rests on the substantive claims set forth in Counts I and IV, which have been dismissed as time-barred. Counts III and V are therefore also dismissed.

## III. RICO

In Count VI, plaintiffs assert that defendants' conduct, as alleged in its duty of fair representation claims and as set forth below, amounts to criminal racketeering in violation of RICO, 18 U.S.C. §§ 1961 *et seq.* 18 U.S.C. § 1962(c) provides:

> It shall be unlawful for any person employed by or associated with

---

arguments are inapposite. The relevant breach for purposes of determining when these claims accrued is not when plaintiffs knew that they would receive inferior terms of employment. Plaintiffs could have known the employment terms without knowing that they were entitled to the more favorable terms of the CBA; the heart of their claim is that defendants' misrepresentations precluded them from exercising recall rights under the CBA.

[8] Count III seeks a declaratory judgment that "the modifications to the pay rates must be set aside, and an injunction restoring the status quo and awarding backpay and benefits." Am. Compl. ¶ 245. Count V seeks a declaratory judgment "setting aside those portions of the American Eagle contract that governed pay rates and declaring that the [CBA] applied." *Id.* ¶ 263.

> any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

To state a claim under RICO, the plaintiff must allege that the defendant engaged in the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity," *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985), and that the alleged RICO violation was the proximate cause of plaintiff's injury, *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 267-68 (1992). RICO defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *See* 18 U.S.C. § 1961(4). Plaintiffs must allege a "pattern" of racketeering activity consisting of at least two predicate acts that are related and "amount to or pose a threat of continued criminal activity." *First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159, 178 (2d Cir. 2004) (internal quotation marks omitted). "Racketeering activity" is defined to include "any act which is indictable under" 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C.§ 1951 (the Hobbs Act), 18 U.S.C. § 1952 (the Travel Act), and 29 U.S.C. § 186 (restrictions on payments and loans to labor organizations). *See* 18 U.S.C. § 1961(1)(B). Under the mail and wire fraud statutes, "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," which involves use of the mails or wire is indictable. *See* 18 U.S.C. §§ 1341, 1343.

Defendants argue for dismissal of Count VI on the ground that plaintiffs have failed to adequately plead multiple elements of a RICO violation, including "enterprise", "pattern", and the two predicate acts of "racketeering activity."[9]

---

[9] Defendants also argue for dismissal on the grounds that plaintiffs' RICO claim is "precluded" by federal labor law when "the underlying conduct of the plaintiffs' RICO claim is

13

A.  Facts

In their Amended Complaint, plaintiffs incorporate all of the facts alleged in their duty of fair representation Counts into its RICO Count and additionally allege that, at some point no later than January 2003, defendants, US Airways, and US Airways Group, Inc. formed "an association-in-fact and enterprise" with the joint purpose of: (1) "assur[ing] a far lower wage scale and benefit level for that group of flight attendants and other employees than what they would otherwise be entitled to"; (2) "seek[ing] to assure that the 'MidAtlantic' flight attendants and other employees would leave the employ of US Airways by transferring over to Republic Airways, Inc., regardless of whether or not they would be securely employed for any period of time and without a right to return to US Airways"; and (3) prevent[ing] a legitimate grievance from going forward during a time period in which the arbitration award would still be meaningful." Am. Compl. ¶¶ 266-67, 276. Plaintiffs allege that each defendant "played a significant and substantive role in directing the affairs of the enterprise" and "controlled and participated in the management of the enterprise." *Id.* ¶¶ 269, 271.

Plaintiffs further allege that defendants were motivated by "financial and monetary

---

wrongful *only by virtue of the labor laws*." Dfs. Mem. at 14-18 (citing *Talbot v. Robert Matthews Distrib. Co.*, 961 F.2d 654, 662 (7th Cir. 1992); *Brennan v. Chestnut*, 973 F.2d 644, 646 (8th Cir. 1992)). Defendants disclaim that this argument is an argument for preemption but fail to identify any rationale, other than preemption, which would arguably support their analysis. The pertinent cases in this circuit, while recognizing that courts in other circuits have reached a different conclusion regarding preemption, are contrary to defendant's position. *See A. Terzi Productions, Inc. v. Theatrical Protective Union*, 2 F. Supp. 2d 485, 502-03 (S.D.N.Y. 1998) (Sotomayor, J.) (surveying the case law and holding that "courts in this Circuit have consistently rejected the notion that *Garmon* preemption [which provides for deference to the exclusive competence of the NLRB when a proscribed activity is also arguably subject to § 7 or § 8 of the NLRA] applies to federal claims, including RICO claims"); *Gregory v. American Guild of Musical Arts*, 1993 WL 179110, at *5 (S.D.N.Y. 1993) (holding that a RICO claim based upon violation of the duty of fair representation is not preempted by federal labor law). In light of this court's conclusions as to the utter inadequacy of the RICO pleading in this case, the court will not address this issue further.

advantages that would accrue to each other and/or by the desire to avoid creating unrest among its members." *Id.* ¶ 278. To that end, defendants "devised and/or directed" at least one of the six "implementing schemes" in furtherance of their goals:

1. Falsely disseminating by mail and by wire (on AFA and US Airways, Inc. websites) the idea that "MidAtlantic" was and is an entity separate from US Airways, so as to seek to justify the much lower wage and benefit package offered to the plaintiffs (and other [MidAtlantic] flight attendants employed by US Airways);

2. Wrongfully denying recall rights and the protections advantage of the [CBA] to those flight attendants who became employed in US Airways' "MidAtlantic" operation;

3. Making sure that the "MidAtlantic" flight attendants were covered not by the [CBA], but by an unrelated collective bargaining agreement negotiated between American Eagle . . . and its flight attendants at a much lower pay and with severely diminished benefits;

4. Denying the flight attendants the opportunity to ratify changes to their collective bargaining agreement, despite the fact that the flight attendants had an unfettered right of balloting in this regard;

5. Wrongfully withholding from the "MidAtlantic" flight attendants certain flow-back rights that would permit them, even after transferring to Republic Airways, Inc., the right to return to the US Airways seniority list;

6. Pressuring the "MidAtlantic" flight attendants to transfer to Republic Airways, Inc.

*Id.* ¶¶ 270, 290. Plaintiffs allege that defendants not only knew of and participated in their own strategies and activities, but they also knew of and participated in those strategies and activities engaged in by the other constituent members.

As a result of defendants' activities, plaintiffs allege that they remained unclear about various aspects of their employment, including "who their employer was, whether they were actively represented by AFA and, in particular, by the US Airways MEC; what collective bargaining agreement, if any, they were operating under; whether they were currently on the US Airways flight

15

attendants seniority list; whether they had any rights under the [CBA], and what their rights would be with regard to the then-upcoming merger of US Airways with America West Airlines and the ultimate integration of the two seniority lists." *Id.* ¶ 291. Plaintiffs further allege that they were injured "in that [they] were deprived of their rightful wages and benefits as furloughees recalled to US Airways; were denied the right to ratify crucial changes to their employment contract; were denied the right to return to US Airways even if they transfer to Republic; and were denied the opportunity, if they chose to transfer to Republic, to know what the terms of employment would be at Republic and, in fact, whether there would be any employment at all for them." *Id.* ¶ 308.

### B. Enterprise

The Supreme Court has held that a RICO "enterprise" is "a group of persons associated together for a common purpose of engaging in a course of conduct", the existence of which is proven by "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *United States v. Turkette*, 452 U.S. 576, 583 (1981). Defendants argue, and plaintiffs do not contest, that they have offered only "bald accusations" as to the existence of the alleged enterprise. Dfs. Mem. at 22. Apart from two paragraphs in their Amended Complaint where plaintiffs offer the same conclusory statement that defendants formed an association-in-fact,[10] there are no other allegations that set forth the requirements of a RICO enterprise. Plaintiffs have not alleged any facts as to the "hierarchy, organization and activities" of the enterprise, *United States v. Coonan*, 938 F.2d 1553, 1560-61 (2d Cir. 1991), or any facts

---

[10] In ¶ 266, plaintiffs state: "Between sometime no later than January 2003 and the date hereof, AFA, Pat Friend, as President of AFA, US Airways, Inc., and US Airways Group, Inc. formed an association-in-fact and enterprise . . . ." In only slightly different words, plaintiffs state in ¶ 275: "In or about a period of time commencing no later than the first half of 2003 (and quite possibly significantly earlier than that), AFA, and US Airways, Inc. (together with US Airways Group, Inc., which then was US Airways, Inc.'s parent company) formed an association-in-fact . . . ."

specifying "how these members joined together as a group to achieve [their] purposes," *Moll v. U.S. Life Title Ins. Co.*, 654 F. Supp. 1012, 1031 (S.D.N.Y. 1987). At most, plaintiffs have alleged independent, albeit similar, activities by each member of the enterprise in defrauding plaintiffs about MidAtlantic's true corporate status, but such allegations do not show that the constituent members functioned as a unit or that they were "associated together for a common purpose of engaging in a course of conduct." *Turkette*, 452 U.S. at 583; *First Capital Asset Management*, 385 F.3d at 174-75.

Plaintiffs cannot merely rely on their argument that particularized requirements for RICO claims are substantially relaxed at the pleading stage. Although plaintiffs do not need "detailed factual allegations", they are nonetheless obligated to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S.Ct. at 1964.

Plaintiffs request, in the event the court finds the Amended Complaint deficient in setting forth its RICO claim, that they be granted leave to amend. Federal Rule of Civil Procedure 15(a) provides that "leave shall be freely given", but particularly in cases of pleading a claim under a statute such as RICO, which sets forth exacting pleading requirements, leave to replead can be denied where granting it would be futile. *See, e.g.*, *In re American Express Co. Shareholders Litig.*, 39 F.3d 395, 402 (2d Cir. 1994). Such is the case here. There is no reason to conclude that plaintiffs could add allegations that could overcome the multiple deficiencies in the existing pleading. Indeed, plaintiffs' counsel admitted at oral argument that, short of discovery, they have no additional facts they could add to the existing Amended Complaint. *See* Oral Arg. Tr. (Mar. 7, 2008) at 36-37. "[D]iscovery is authorized for parties to develop the facts in a lawsuit in which a plaintiff has stated a legally cognizable claim, not in order to permit a plaintiff to find out whether he has such a claim." *Podany v. Robertson Stephens, Inc.*, 350 F. Supp. 2d 375, 378 (S.D.N.Y. 2004).

Because the Amended Complaint is entirely deficient in pleading the element of "enterprise" and can be dismissed on this ground, the court does not reach the other grounds for dismissal. For the reasons stated above, Count VI is thereby dismissed and plaintiffs' request for leave to amend is denied.

## CONCLUSION

For all of the foregoing reasons, defendant's motion to dismiss plaintiffs' First Amended Complaint in its entirety is granted.

**SO ORDERED.**

/s
**NINA GERSHON**
**United States District Judge**

Dated: Brooklyn, New York
March 27, 2008